Gina M. Serra, SBN 361172
**RIGRODSKY LAW, P.A.**
1091 N. Palm Canyon Drive, Suite 9
Palm Spring, CA 92262
Telephone: (760) 406-8009
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

LEEANNE SWIFT, Derivatively on Behalf of Nominal Defendant RXSIGHT, INC.,

    Plaintiff,

    v.

RON KURTZ, SHELLEY THUNEN, J. ANDY CORLEY, WILLIAM J. LINK, JULIET TAMMENOMS BAKKER, ROBERT WARNER, JULIE B. ANDREWS, ROBERT J. PALMISANO, SHWETA SINGH MANIAR, and TAMARA R. FOUNTAIN,

    Defendants,

    and

RXSIGHT, INC.,

    Nominal Defendant.

Case No. _____

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff LeeAnne Swift ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant RxSight, Inc. ("RxSight" or the "Company"), against current members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding RxSight, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Makaveev v. RxSight, Inc., et al,* Case No. 8:25-cv-01596-FWS-KES (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought by Plaintiff on behalf of RxSight against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least November 7, 2024, and July 8, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      RxSight is a commercial-stage medical technology company focused on the research, development, manufacture, and sale of light adjustable intraocular lenses ("IOL") used in cataract surgery in the United States. The Company's proprietary product is the RxSight Light Adjustable Lens system (the "RxSight

---

[1] Individual Defendants are Ron Kurtz ("Kurtz"), Shelley Thunen ("Thunen"), J. Andy Corley ("Corley"), William J. Link ("Link"), Juliet Tammenoms Bakker ("Bakker"), Robert Warner ("Warner"), Julie B. Andrews ("Andrews"), Robert J. Palmisano ("Palmisano"), Shweta Singh Maniar ("Maniar"), and Tamara R. Fountain ("Fountain"). The Individual Defendants, together with RxSight, are "Defendants."

System"), which is comprised of RxSight Light Adjustable Lens® ("LAL"), RxSight Light Delivery Device ("LDD"), and accessories.

3.     As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly touted the Company's RxSight System sales and the Company's overall financial performance.

4.     However, the truth was revealed on July 8, 2025, when, after the market closed, the Company issued a press release announcing its preliminary financial results for the second quarter of 2025 (the "Preliminary 2Q25 Earnings Release"), which revealed that the Company was experiencing significant declines in LDD sales, LAL utilization, and overall revenue. The Company also revealed that it was lowering its full year 2025 guidance by approximately $42.5 million at the midpoint.

5.     On the same day, the Company hosted an earnings call for investors and analysts to discuss the Company's preliminary financial results for the second quarter of 2025 (the "Preliminary 2Q25 Earnings Call"). During the Preliminary 2Q25 Earnings Call, Defendant Kurtz revealed that "adoption challenges *over the last few quarters* have been a primary reason for the LDD stall."

6.     On this news, RxSight's stock price fell $4.84 per share, or approximately 37.8%, to a close at $7.95 per share on July 9, 2025.

7.     As set forth herein, throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company was experiencing "adoption challenges" and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) the Company had overstated the demand for its

products; (iv) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.    As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Kurtz and Thunen on July 22, 2025, in the United States District Court for the Central District of California.

9.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

10.    Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of RxSight's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over

the claims asserted herein for violations of Sections 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, RxSight is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## **PARTIES**

### *Plaintiff*

16.    Plaintiff is, and has been at all relevant times, a continuous shareholder of RxSight.

### *Nominal Defendant*

17.    Nominal Defendant RxSight is a Delaware corporation with its principal executive offices located at 100 Columbia, Aliso Viejo, California 92656. RxSight's common stock is traded on the NASDAQ under the ticker symbol "RXST."

*Individual Defendants*

18.    Defendant Kurtz has served as President, Chief Executive Officer ("CEO"), and a director of the Company since 2016. According to the Company's proxy statement filed with the SEC on a Schedule 14A on April 21, 2025 (the "2025 Proxy"), Defendant Kurtz received $6,982,453 in total compensation from the Company in 2024.

19.    Defendant Thunen has served as the Chief Financial Officer of the Company since February 2017. Thunen previously served as Chief Administrative Officer of the Company from January 2016 until February 2017. According to the 2025 Proxy, Defendant Thunen received $5,796,727 in total compensation from the Company in 2024.

20.    Defendant Corley has served as a director of the Company since January 2015 and as Chairman of the Board since July 2015. Corley also serves as a member of the Company's Compensation Committee and Corporate Governance and Nominating Committee (the "Governance Committee"). According to the 2025 Proxy, Defendant Corley received $262,445 in total compensation from the Company in 2024.

21.    Defendant Link has served as a director of the Company since November 2016. According to the 2025 Proxy, Defendant Link received $201,195 in compensation from the Company in 2024.

22.    Defendant Bakker has served as a director of the Company since June 2015. Bakker also serves as a member of the Company's Audit Committee and Governance Committee. According to the 2025 Proxy, Defendant Bakker received $214,945 in compensation from the Company in 2024.

23.    Defendant Warner has served as a director of the Company since August 2021. Warner also serves as Chair of the Company's Governance Committee and as a member of the Company's Compensation Committee.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

According to the 2025 Proxy, Defendant Warner received $217,445 in compensation from the Company in 2024.

24.    Defendant Andrews has served as a director of the Company since August 2021. Andrews also serves as Chair of the Company's Audit Committee. According to the 2025 Proxy, Defendant Andrews received $219,945 in compensation from the Company in 2024.

25.    Defendant Palmisano has served as a director of the Company since August 2021. Palmisano also serves as Chair of the Company's Compensation Committee. According to the 2025 Proxy, Defendant Palmisano received $214,945 in compensation from the Company in 2024.

26.    Defendant Maniar has served as a director of the Company since December 2021. Maniar also serves as a member of the Company's Governance Committee. According to the 2025 Proxy, Defendant Maniar received $204,945 in compensation from the Company in 2024.

27.    Defendant Fountain has served as a director of the Company since January 2022. Fountain also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Defendant Fountain received $209,945 in compensation from the Company in 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28.    By reason of their positions as officers and/or directors of RxSight, and because of their ability to control the business and corporate affairs of RxSight, the Individual Defendants owed RxSight and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage RxSight in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RxSight and its shareholders.

29.    Each director and officer of the Company owes to RxSight and its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

30.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of RxSight, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.    To discharge their duties, the officers and directors of RxSight were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

32.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of RxSight, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

34.    To discharge their duties, the officers and directors of RxSight were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of RxSight were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to RxSight's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how RxSight conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of RxSight and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that RxSight's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

operations would comply with all applicable laws and RxSight's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)  Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

35.    Each of the Individual Defendants further owed to RxSight and the shareholders the duty of loyalty requiring that each favor RxSight's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

36.    At all times relevant hereto, the Individual Defendants were the agents of each other and of RxSight and were at all times acting within the course and scope of such agency.

37.    Because of their advisory, executive, managerial, and directorial positions with RxSight, each of the Individual Defendants had access to adverse, non-public information about the Company.

38.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by RxSight.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

42.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of RxSight, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall

contribution to and furtherance of the wrongdoing.

44.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of RxSight and at all times acted within the course and scope of such agency.

## RXSIGHT'S CODE OF CONDUCT

45.    RxSight's Code of Conduct applies to "[a]ll directors, officers and employees (who, unless otherwise specified, will be referred to jointly as '**employees**') of RxSight, Inc. (together with any subsidiaries, collectively the '**Company**'), as well as Company contractors, consultants and agents."

46.    Under the section titled "Purpose," the Code of Conduct states, in part:

> This Code of Business Conduct and Ethics (this "Code") is designed to deter wrongdoing and to promote:
>
> 1.    fair and accurate financial reporting;
>
> 2.    compliance with applicable laws, rules and regulations including, without limitation, full, fair, accurate, timely and understandable disclosure in reports and documents the Company files with, or submit to, the U.S. Securities and Exchange Commission and in the Company's other public communications;
>
> 3.    the prompt internal reporting of violations of this Code as set forth in this Code;
>
> 4.    honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest; and
>
> 5.    a culture of honesty and accountability.

47.    Under the section titled "Financial Reports and Other Records – Disclosure," the Code of Conduct states:

> Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.
>
> Each employee involved in the Company's disclosure process must

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

Employees must maintain all of the Company's books, records, accounts and financial statements in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, employees must ensure that all books, records, accounts and financial statements conform both to applicable legal requirements and to the Company's system of internal controls. Employees must carefully and properly account for all assets of the Company. Employees may not establish any undisclosed or unrecorded account or fund for any purpose. Employees shall not make any false or misleading entries in the Company's books or records for any reason, or disburse any corporate funds or other corporate property without adequate supporting documentation and authorization. Employees shall not misclassify transactions related to accounts, business units or accounting periods. Each employee bears responsibility for ensuring that they are not party to a false or misleading accounting entry.

48.    Under the section titled "Conflicts of Interest," the Code of Conduct states:

You must act and behave in the Company's best interests and not based on personal relationships or benefits. You should avoid situations where your personal activities and relationships conflict, or appear to conflict, with the Company's interests. Examples of conflicts of interest may include transactions with family members, interests in other businesses, gifts or gratuities and personal use of Company assets.

Evaluating whether a conflict of interest exists can be difficult and may involve a number of considerations. Employees should seek guidance from their manager, the Compliance Officer or Human Resources when they have any questions or doubts.

If an employee is aware of an actual or potential conflict of interest where their interests may conflict with the Company's interests, or is concerned that a conflict might develop, they should discuss with their manager, the Compliance Officer or Human Resources and then obtain approval from the Compliance Officer before engaging in that activity or accepting something of value.

If a director is aware of an actual or potential conflict of interest where their interests may conflict with the Company's interests, or is concerned that a conflict might develop, they should discuss with the Audit Committee and then obtain approval from the Audit Committee before engaging in that activity or accepting something of value.

49.    Under the section titled "Compliance with Laws, Rules and

Regulations," the Code of Conduct states, in relevant part:

> All employees must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct.
> Employees have an obligation to be knowledgeable about specific laws, rules and regulations that apply to their areas of responsibility. If a law conflicts with a policy in this Code, employees must comply with the law.

> Any questions as to the applicability of any law should be directed to the Compliance Officer. The following is a brief summary of certain topics about which employees should be aware. . . .

> 5. <u>Insider Trading</u>. Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because employees will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information to could constitute insider trading, violating the law. It is an employee's responsibility to comply with these laws and not to share material nonpublic information. . . .

> 10. <u>Keeping the Audit Committee Informed</u>. The Audit Committee plays an important role in ensuring the integrity of the Company's public reports. If an employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee of the Board of Directors. In particular, any employee should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:

> a. the accuracy of material disclosures made by the Company in its public filings;

> b. material weaknesses or significant deficiencies in internal control over financial reporting;

> c. any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or

> d. any evidence of a material violation of the policies in this Code regarding financial reporting.

> 11. <u>Maintaining and Managing Records</u>. The Company is required by local, state, federal, foreign and other applicable laws, rules and regulations to retain certain records and to follow specific guidelines in managing its records. Records include all recorded information, regardless of medium or characteristics. Civil and criminal

penalties for failure to comply with such guidelines can be severe for employees, agents, contractors and the Company.

## RXSIGHT'S AUDIT COMMITTEE CHARTER

50.    Pursuant to RxSight's Audit Committee Charter, the purpose of the Audit Committee is to:

[A]ssist the Board in its oversight of:

1.    the accounting and financial reporting processes and internal controls of the Company;

2.    the audit and integrity of the Company's financial statements;

3.    the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4.    the qualifications, independence and performance of the Company's independent auditors; and

5.    the implementation and performance of the Company's internal audit function, if applicable.

51.    The Audit Committee Charter lays out the following "Responsibilities" of the Audit Committee:

1.    Appoint and Oversee Independent Auditor; Approve Audit and Non-Audit Services. The Committee will be directly responsible for appointing, compensating, retaining, evaluating and overseeing an independent registered public accounting firm to act as the Company's independent auditor for the purpose of auditing the Company's financial statements, books, records, accounts and internal control over financial reporting, and, where appropriate, replacing the independent auditor. The Committee shall also appoint, retain, compensate, oversee and, where appropriate, replace any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. Any such appointments or approvals may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to the Chairperson of the Committee so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting. . . .

3.    Review of Internal Controls and Integrity of Financial Statements. The Committee shall periodically meet with management, the internal audit function, if applicable, and the Company's independent auditor to review and discuss the Company's internal

controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

a. the scope and timing of the annual audit of the Company's financial statements;

b. the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c. the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

d. the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

e. the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

f. any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

g. any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

h. the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

i. any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management. . . .

4.    <u>Review of Financial Information Presentation, Earnings Press Release and Guidance</u>. The Committee shall periodically discuss with

management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies. The Chairperson of the Committee may represent the entire Committee for the purposes of such discussions.

7. <u>Conflicts of Interest</u>. The Committee shall review and monitor compliance with the Company's Code of Business Conduct and Ethics and consider questions of actual or possible conflicts of interest of Board members and of corporate officers and approve or prohibit applicable transactions or matters. . . .

9. <u>Compliance with Laws</u>. On at least an annual basis, the Committee shall review and discuss with management and the independent auditor (a) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (b) reports regarding compliance with applicable laws, regulations and internal compliance programs. The Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any reports or complaints that raise material issues regarding the Company's financial statements or policies. The Committee must discuss with the Company's Chief Financial Officer and/or General Counsel (if one is serving) any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

10. <u>Enterprise Risk Management</u>. The Committee shall review and discuss with management, including the Company's internal audit function, if applicable, and the Company's independent auditor guidelines and policies to identify, monitor, and address enterprise risks, including those risks related to cybersecurity. This shall include discussion of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures. The Committee shall also oversee and monitor management's plans to address such risks. In connection with its review of enterprise risk, management's assessment thereof and any draft risk factors presented by management, the Committee is entitled to rely on management's identification and assessment of the operational, financial, strategic, regulatory and other risks described. . . .

12. <u>Report to Full Board</u>. The Committee must review with the full Board any issues that arise regarding: (a) the quality or integrity of the Company's financial statements; (b) the Company's compliance with legal or regulatory requirements; (c) the performance and independence of the Company's independent auditor; and (d) the performance of the internal audit function, if applicable.

## **SUBSTANTIVE ALLEGATIONS**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Background*

52.    RxSight is a commercial-stage medical technology company focused on the research, development, manufacture, and sale of light adjustable IOL used in cataract surgery in the United States. The Company's proprietary product is the RxSight System, which is comprised of RxSight LAL, RxSight LDD, and accessories.

53.    The Company's LAL is a premium IOL made of proprietary photosensitive material that changes shape in response to specific patterns of ultraviolet light generated by the RxSight LLD.

54.    The Company touts the RxSight System as providing "customize[d] and otimize[d] visual acuity for patients." The Company has explained that, with the RxSight System, unlike other premium IOL technologies, after the surgeon implants the LAL as they would in any other cataract procedure, the surgeon determines refractive error with patient input several weeks following surgery, and then uses the LDD to modify the LAL with the precise visual correction needed to achieve the patient's desired vision outcome.

55.    As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly.

***The Individual Defendants' False and Misleading Statements***

56.    On November 7, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). In the 3Q24 Earnings Release, the Company highlighted its financial results and touted the demand for the RxSights System, stating, in relevant part:

**Key Quarterly Highlights**

- Reported third quarter 2024 revenue of $35.3 million, an increase of 59% compared to the third quarter of 2023, reflecting:

  - ***The sale of 24,554 Light Adjustable Lenses (LAL™/LAL+™), representing an 80% increase in***

*procedure volume compared to the third quarter of 2023*;[2] and

    o **The sale of 78 Light Delivery Devices (LDD™s), representing a 18% increase in unit sales compared to the third quarter of 2023 and expanding the installed base to 888 LDDs at the end of the quarter, representing a 51% increase compared to the end of the third quarter of 2023**.

- The company raised its 2024 full-year revenue guidance to the top of its previous guidance range, increased its gross margin guidance and lowered its operating expense guidance. . . .

**Third Quarter Financial Results**

In the third quarter of 2024, total revenue was $35.3 million, an increase of 59% compared to $22.2 million in the third quarter of 2023. Revenue growth was driven by a 79% increase in LAL revenue and a 28% increase in LDD revenue, compared to the third quarter of 2023.

Gross profit for the third quarter of 2024 was $25.2 million or 71.4% of revenue, an increase of $11.5 million or 84% compared to gross profit of $13.7 million or 61.9% of revenue for the third quarter of 2023. The year over year increase in gross profit was driven by continued growth in the percentage of LAL sales as a proportion of total sales, lower cost of sales for both the LDD and LAL, and sustained pricing stability for company's capital equipment.

57.    Additionally, Defendant Kurtz was quoted in the 3Q24 Earnings Release as stating, in relevant part, that:

We are pleased to report another strong quarter driven by ongoing demand and enthusiasm for the RxSight system[.] With 78 LDDs sold this quarter and sustained growth in LAL sales, we continue to see recognition of the transformative power of adjustability and the significant value it provides to both patients and doctors. We believe our third-quarter results position us for a strong finish to 2024 and for continued success in the years to come.

58.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Thunen touted the Company's financial results and LAL and LDD sales and utilization, stating, in

---

[2] Emphasis is added unless otherwise noted.

relevant part:

> RxSight generated third quarter 2024 revenue of $35.3 million, up 59% compared to $22.2 million in the year ago quarter and up 1% compared to $34.9 million in the second quarter of 2024.

> During the quarter, we sold 24,554 LALs and generated $24.2 million in LAL revenue, up 79% and 2% compared to the same year ago quarter and the second quarter of this year, respectively. This sequential performance reflects typical seasonality in cataract surgery volumes, which tend to dip in the third quarter as both doctors and patients often travel during the summer months.

> Additionally, in the third quarter, LAL revenue represented 69% of total revenue, an increase from 61% in the year ago period and from 68% in the second quarter of 2024. We sold 78 LDDs in the third quarter, up 18% to the 66 units in the year ago period and matching the 78 units sold in the second quarter that is typically stronger for capital equipment.

> During the period, LDD sales generated revenue of $10.1 million, up 28% versus the third quarter of 2023 and essentially the same as the second quarter of 2024. As of September 30, 2024, our LDD installed base stood at 888 units, representing an increase of 51% and 10% versus the year ago period and the second quarter of 2024, respectively. Reflecting continued demand, our average selling price for the LDD remained stable at approximately $130,000.

> During the quarter, average monthly utilization, defined as the number of LALs implanted in the quarter divided by the LDD installed base in the previous quarter was 10.1 LALs per LDD, up from 8.7 LALs per LDD in the same period last year. While LAL growth remained strong in the third quarter, average monthly utilization was lower than the 11 LALs per LDD seen in the second quarter, a period that was and is generally a seasonally strong quarter.

> The gross margin in the third quarter of 2024 was 71.4% compared to 61.9% in the same year ago quarter and 69.5% in the second quarter of 2024. The year-over-year increase reflects the continued increase in the percentage of LALs as a percentage of sales, lower cost of sales for both the LDD and LAL, and sustained pricing stability.

59.     Also on November 7, 2024, the Company filed its quarterly report for the period ended September 30, 2024, on a Form 10-Q with the SEC (the "3Q24 10-Q"). In addition to reaffirming the previously reported financial results, the 3Q24 10-Q reported on "key business metrics," and touted the Company's LDD and LAL sales, stating, in relevant part:

**Key business metrics**

We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. We believe the number of LDDs installed and LALs implanted are indicators of our ability to drive adoption and generate revenue.

We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric indicative of adoption and utilization of our RxSight system.

|  | 2024 | | | 2023 | | | |
|  | Q1 | Q2 | Q3 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|
| LDDs Sold | 66 | 78 | 78 | 56 | 67 | 66 | 77 |
| Installed Base at End of Period | 732 | 810 | 888 | 456 | 523 | 589 | 666 |

|  | 2024 | | | 2023 | | | |
|  | Q1 | Q2 | Q3 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|
| LALs Sold | 20,218 | 24,214 | 24,554 | 10,523 | 12,622 | 13,657 | 18,071 |

During the quarter ended September 30, 2024, we had increased LDD sales of 12 and increased LAL sales of 10,897 when compared to the quarter ended September 30, 2023 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base.

Our quarterly and annual financial results may fluctuate as a result of a variety of factors many of which are outside our control. We may not yet be able to accurately assess seasonality and other trends, and we will continue to evaluate our business in the future using these and other financial metrics as we observe trends in our business. . . .

For the three and nine months ended September 30, 2024 and 2023, revenue from contracts with customers consisted of the following (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2024 | 2023 | 2024 | 2023 |
|---|---|---|---|---|
| LDD (including training) | $        10,128 | $        7,932 | $        29,030 | $        22,127 |
| LAL | 24,231 | 13,502 | 67,975 | 36,308 |
| Service warranty, service contracts, and accessories | 955 | 765 | 2,708 | 2,062 |
|  | $        35,314 | $        22,199 | $        99,713 | $        60,497 |

. . . .

**Sales**

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Sales increased by $13.1 million, or 59.1%, to $35.4 million for the three months ended September 30, 2024, from $22.2 million for the three months ended September 30, 2023. The increase in total sales was primarily due to the incremental sales of 10,897 LALs and 12 LDDs from strong adoption of our RxSight system by practices and doctors.

60.    The 3Q24 10-Q also warned of certain hypothetical risks to the Company, despite many of them already having materialized. Specifically, the 3Q24 10-Q stated, in relevant part:

The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors.

Our success will depend, in part, on the acceptance of our RxSight system as safe, effective and, with respect to doctors, cost-effective. . . .

Our results of operations **could** be materially harmed **if** we are unable to accurately forecast customer demand for our products and manage our inventory.

We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers*, **we forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions***

61.    The 3Q24 10-Q was signed by Defendants Kurtz and Thunen. The 3Q24 10-Q was also accompanied by certifications made by Defendants Kurtz and Thunen, pursuant to Rules 13a-14(a) and 15d-14(a) of the Exchange Act, as adopted by Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein they attested to the accuracy of the 3Q24 10-Q.

62.    On January 12, 2025, the Company issued a press release announcing its preliminary financial results for the fourth quarter and full year of 2024 (the "Preliminary 4Q24 Earnings Release"). In the Preliminary 4Q24 Earnings Release,

the Company touted the Company's financial results and the demand for the RxSight System, stating, in relevant part:

**Preliminary Unaudited Fourth Quarter and Full-year 2024 Results**

- Preliminary unaudited fourth quarter 2024 revenue is expected to be approximately $40.2 million, representing growth of approximately 41% compared to the prior year period, driven by:

  - The sale of 29,069 Light Adjustable Lenses (LAL™/LAL+®); representing a 61% increase in procedure volume compared to the fourth quarter of 2023; and

  - The sale of 83 Light Delivery Devices (LDD™s), expanding the installed base to 971 LDDs as of December 31, 2024, representing a 46% increase compared to the installed base at end of the fourth quarter of 2023.

- Preliminary unaudited 2024 fiscal year revenue is expected to be approximately $139.9 million, representing growth of approximately 57% compared to the prior year, driven by:

  - The sale of 98,055 LALs; representing a 79% increase in procedure volume compared to 2023; and
  - The sale of 305 LDDs.

- Preliminary unaudited cash, cash equivalents and short-term investments as of December 31, 2024, is expected to be $237.2 million.

"During the fourth quarter, we achieved record highs for LDD sales and LAL procedures, meaningfully exceeding our initial full-year 2024 revenue guidance. With nearly one thousand LDDs installed, we now serve an estimated 15% of cataract surgeons in North America, while LAL procedures account for over 10% of the region's premium IOL market. We believe this sustained growth in one of ophthalmology's most competitive segments reflects the growing recognition of the superior visual outcomes enabled by adjustability," said Dr. Ron Kurtz, Chief Executive Officer and President of RxSight. "In 2025, we expect adoption for the RxSight system to remain strong as we collaborate with a diverse range of customers to further expand the infrastructure for post-operative light treatments. Building on our momentum in North America, we also look forward to entering key international markets in Asia and Europe. Finally, leveraging the foundation established since our initial FDA approval, we plan to continue to innovate the RxSight system, that we believe will continue to set the standard for the premium IOL market for years to come."

**2025 Guidance**

RxSight anticipates full-year 2025 revenue in the range of $185.0

million to $197.0 million, reflecting growth of approximately 32% to 41% over 2024. The company currently estimates the full-year 2025 gross profit margin to be in the 71% to 73% range. In addition, the company expects full-year 2025 operating expenses in the range of $165.0 million to $170.0 million, including non-cash stock-based compensation expense guidance in the range of $22.0 million to $25.0 million.

63.    On February 25, 2025, the Company issued a press release announcing its official financial results for the fourth quarter and full year for 2024 (the "4Q24 Earnings Release"). In the 4Q24 Earnings Release, the Company again touted its financial results and the demand for the RxSight System, stating, in relevant part:

**Key Quarterly and Full-Year Highlights**

- Recognized fourth quarter 2024 revenue of $40.2 million, an increase of 41% compared to the fourth quarter of 2023, reflecting:

  o The sale of 29,069 Light Adjustable Lenses (LAL™/LAL+®), representing an 61% increase in procedure volume compared to the fourth quarter of 2023; and

  o The sale of 83 Light Delivery Devices (LDD™s), expanding the installed base to 971 LDDs at the end of the quarter, a 46% increase compared to the 666-unit LDD installed base at the end of the fourth quarter of 2023.

- Recognized full-year 2024 revenue of $139.9 million, a 57% increase over 2023, driven by unit sales of 98,055 LALs and 305 LDDs, representing growth of 79% and 15% respectively, compared to 2023. . . .

**Fourth Quarter Financial Results**

In the fourth quarter of 2024, total revenue was $40.2 million, an increase of 41% compared to $28.6 million in the fourth quarter of 2023. Revenue growth was driven by a 60% increase in LAL revenue and a 7% increase in LDD revenue, compared to the fourth quarter of 2023.

Gross profit for the fourth quarter of 2024 was $28.8 million or 71.6% of revenue, an increase of $11.1 million compared to gross profit of $17.7 million or 61.8% of revenue for the fourth quarter of 2023. The year over year increase in gross profit was driven by continued growth in the percentage of LAL sales as a proportion of total sales, lower cost of sales for both the LDD and LAL, and sustained pricing stability for company's capital equipment. . . .

**Fiscal Year 2024 Financial Results**

Full-year 2024 total revenue was $139.9 million, an increase of 57% compared to the full year of 2023. The increase in 2024 revenue was driven by a 78% increase in LAL revenue and 24% increase in LDD revenue compared to 2023.

Gross profit for the full year of 2024 was $98.9 million, or 70.7% of revenue compared to gross profit of $53.8 million, or 60.4% of revenue for the full year of 2023. The increase in gross profit was due to a favorable product mix from a greater percentage of revenue from LAL sales and increased margins on the LDD introduced during the third quarter of 2023.

64.    The 4Q24 Earnings Release also included the Company's fiscal year 2025 guidance:

**2025 Guidance**

The company is reiterating guidance for the full-year 2025 revenue, gross profit margin, and operating expenses:

- Revenue in the range of $185.0 million to $197.0 million, representing implied growth of approximately 32% to 41% compared to 2024;

- Gross margin in the range of 71% to 73%, representing an implied increase of 30 bps to 230 bps compared to 2024;

- Operating expenses in the range of $165.0 to $170.0 million, representing an implied increase of 22% to 25% compared to 2024;

- Operating expense guidance also includes non-cash expenses in the range of $22.0 million to $25.0 million.

65.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the quarter (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Thunen reiterated the Company's "strong" financial results and touted its LDD and LAL sales, stating, in relevant part:

Consistent with our January preannouncement *RxSight reported fourth quarter 2024 revenue of $40.2 million, up 41% compared to the year ago quarter. Growth was broad based, driven by strong growth in LAL procedure volume and the continued expansion of our installed base of LDDS.*

The positive momentum we saw throughout 2024 remains fueled by surgeons increasing appreciation of the clinical advantage and economic value of the RxSight system, particularly the benefits of post operative adjustability. ***LAL sales maintained strong growth in the fourth quarter of 2024, reflecting the increased preference amongst surgeons and patients for the enhanced clinical outcomes offered by our adjustable IOLs.***

***We sold a record of 29,069 LALs in the period, up 61% from the fourth quarter of 2023. These procedure volumes translated into LAL revenue of $28.5 million in the fourth quarter of 2024, up 60% compared to the year ago quarter***.

In the fourth quarter of 2024, we sold 83 LDDs and generated $10.7 million in LDD revenue. ***We ended 2024 with an LDD installed base of 971 units, up 46% compared to the 666 units installed at the end of 2023. Higher LAL volume in the fourth quarter also led to an increased LAL revenue mix, with LAL revenue*** accounting for 71% of total revenue, up from 62% in the fourth quarter of 2023. This shift in mix, combined with LDD sales with a lower manufacturing cost and higher average selling price expanded our gross margin to 71.6% in the fourth quarter of 2024, up from 61.8% in the fourth quarter of 2023.

66.    Also on February 25, 2025, the Company filed its annual report for fiscal year 2024 on a Form 10-K with the SEC (the "2024 10-K"). The 2024 10-K affirmed the Company's previously reported financial results and touted the Company's sales, stating, in relevant part:

**Key business metrics**

We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. We believe the number of LDDs installed and, LALs implanted are indicators of our ability to drive adoption and generate revenue. We believe these are important metrics for our business. We may not yet be able to accurately assess seasonality and other trends, and we will continue to evaluate our business in the future using these and other financial metrics as we observe trends in our business. Our quarterly and annual financial results may fluctuate as a result of a variety of factors many of which are outside our control. For example, it is not uncommon in our industry to experience seasonally weaker sales during the summer months and end-of-year holiday season. We may be affected by other seasonal trends in the future, including severe weather (which can impact the number of elective procedures performed), particularly as our business matures. Additionally, this seasonality may be reflected to a much lesser extent, and sometimes may not be immediately apparent, in our revenue. To the extent we experience this seasonality, it may cause fluctuations in our operating results and

financial metrics and make forecasting our future operating results and financial metrics more difficult.

**We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric indicative of adoption and utilization of our RxSight system**.

|  | 2024 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| LDDs Sold | 66 | 78 | 78 | 83 | 56 | 67 | 66 | 77 |
| Installed Base at End of Period | 732 | 810 | 888 | 971 | 456 | 523 | 589 | 666 |

|  | 2024 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| LALs Sold | 20,218 | 24,214 | 24,554 | 29,069 | 10,523 | 12,622 | 13,657 | 18,071 |

**During 2024, we had increased LDD sales of 39 and increased LAL sales of 43,182 when compared to 2023 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base**. . . .

**Sales**

Sales increased by $50.8 million, or 57.1%, to $139.9 million for the year ended December 31, 2024 from $89.1 million for the year ended December 31, 2023. The increase was due to incremental sales of 43,182 LALs primarily due to continued penetration in existing customers, an increased LDD installed base of 305 and incremental sales of 39 LDDs from strong adoption of our RxSight technology by practices and doctors.

67.    The 2024 10-K also purported to warn of certain hypothetical risks, which, unbeknownst to investors, had already materialized:

**The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors**. . . .[3]

For example, some doctors may choose to utilize our RxSight system on only a subset of their total patient population or may not adopt our RxSight system at all. If we are not able to effectively demonstrate that the use of our RxSight system is beneficial in a broad range of patients, adoption of our product will be limited and may not occur as rapidly as we anticipate or at all, which would have a material adverse effect on our business, financial condition and results of operations. We cannot

---

[3] Emphasis in the original.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

assure you that our products will achieve broad market acceptance among doctors. Additionally, even if our products achieve market acceptance, they may not maintain that market acceptance over time if competing products, procedures or technologies are considered safer or more cost-effective or otherwise superior. Any failure of our products to generate sufficient demand or to achieve meaningful market acceptance and penetration will harm our future prospects and have a material adverse effect on our business, financial condition and results of operations. . . .

***Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.***[4]

We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers, we forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions.

68.    The 2024 10-K was signed by Defendants Kurtz, Thunen, Corley, Link, Bakker, Andrews, Palmisano, Warner, Maniar, and Fountain. The 2024 10-K was also accompanied by SOX Certifications made by Defendants Kurtz and Thunen, wherein they attested to the accuracy of the 2024 10-K.

69.    On April 2, 2025, the Company issued a press release announcing certain preliminary financial results for the first quarter of 2025 (the "Preliminary 1Q25 Earnings Release"). The Preliminary 1Q25 Earnings Release again touted the Company's financial results and the purported strong demand for the RxSight System, stating, in relevant part:

**Preliminary First Quarter 2025 Results**

- Preliminary first quarter 2025 revenue is expected to be

---

[4] Emphasis in the original.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

approximately $37.9 million, representing growth of 28% compared to the prior year period, and a decrease of 6% compared to the fourth quarter of 2024, driven by:

- The sale of 27,579 Light Adjustable Lenses (LAL™/LAL+®); representing a 36% increase in procedure volume compared to the first quarter of 2024; and

- The sale of 73 Light Delivery Devices (LDD™s), bringing the installed base to 1,044 LDDs as of March 31, 2025, which represents a 43% expansion compared to the installed base of 732 LDDs at end of the first quarter of 2024.

70.    The Preliminary 1Q25 Earnings Release also provided revised financial guidance for 2025, reporting marginal decreases from previously reported guidance:

**Revised 2025 Guidance**

The company decreased its 2025 full-year revenue and operating expense guidance as follows:

Revenue in the range of $160.0 million to $175.0 million, a decrease from the previous guidance range of $185.0 million to $197.0 million, representing implied growth of 14% to 25% compared to 2024;

Operating expenses in the range of $150.0 to $160.0 million, a decrease from the previous guidance range of $165.0 million to $170.0 million and now representing an implied increase of 10% to 18% compared to 2024. . . .

71.    On April 21, 2025, the Company filed the 2025 Proxy Statement with the SEC. The 2025 Proxy included a section titled "2024 Business Highlights," wherein the Company touted its LAL and LDD sales for the year. Specifically, the 2025 Proxy stated, in relevant part:

***2024 Business Highlights***[5]

- The sale of 98,055 LALs in 2024, representing a 79% increase in procedure volume as compared to 2023.

- The sale of 305 LDDs in 2024, representing a 15% increase in unit sales compared to 2023 and expanding the installed base to 971 LDDs at the end of 2024, representing a 46% increase compared to the end of 2023.

---

[5] Emphasis in the original.

- Sales for 2024 were $139.9 million, an increase of $50.9 million or 57%, compared to 2023.

- Gross profit for 2024 was $98.9 million, an increase of $45.2 million or 84%, compared to 2023.

- Gross margin for 2024 increased to 70.7% compared to 60.4% in 2023, primarily due to the increased proportion of LAL sales to total sales, lower LDD material costs, and an increase in average LDD selling price. . . .

72.     The 2025 Proxy also assured investors that the Company was effectively overseeing risks to the Company, stating, in relevant part:

**Role of the Board in risk oversight**

Our Board has an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board of Directors is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks and operational risks. The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. The Audit Committee is responsible for overseeing the management of risks relating to accounting matters, financial reporting, internal controls over financial reporting, and cybersecurity. Our Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with Board organization, composition, membership and structure, corporate governance and board performance. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through discussions from committee members about such risks. Our Board believes its administration of its risk oversight function has not negatively affected our Board's leadership structure.

73.     On May 7, 2025, the Company issued a press release announcing its official financial results for the first quarter of 2025 (the "1Q25 Earnings Release"). Again, the Company touted its financial performance and the demand for its RxSight System, stating, in relevant part:

**Key Quarterly Highlights**

- Reported first quarter 2025 revenue of $37.9 million, an increase of 28% compared to the first quarter of 2024, reflecting:

  o The sale of 27,579 Light Adjustable Lenses (LAL®/LAL+®), representing a 36% increase in

30

procedure volume compared to the first quarter of 2024;

  o The sale of 73 Light Delivery Devices (LDD™s), bringing the installed base to 1,044 LDDs as of March 31, 2025, which represents a 43% expansion compared to the installed base of 732 LDDs at end of the first quarter of 2024; and

- The company reiterated its 2025 full-year revenue, gross margin and operating expense guidance.

"The exceptional clinical value delivered by our Light Adjustable Lens continues to drive significant enthusiasm among cataract surgeons," said Ron Kurtz, Chief Executive Officer and President of RxSight. "The excitement and engagement we observed at the recent ASCRS meeting further reinforces our conviction that customization and post-operative adjustability are shaping the future of premium cataract surgery. Supported by strong customer and patient interest, an innovative product pipeline, the expansion of third-party light treatment service center business models, and recent international regulatory approvals, we believe we are well-positioned to lead the next chapter of growth in the premium IOL market."

**First Quarter Financial Results**

In the first quarter of 2025, total revenue was $37.9 million, an increase of 28% compared to $29.5 million in the first quarter of 2024. Revenue growth was driven by a 37% increase in LAL revenue and an 8% increase in LDD revenue, compared to the first quarter of 2024.

Gross profit for the first quarter of 2025 was $28.3 million or 74.8% of revenue, an increase of $7.6 million compared to gross profit of $20.7 million or 70.1% of revenue for the first quarter of 2024. The lower cost of sales for both the LDD and LAL drove the increase in gross profit in the quarter, along with the favorable shift in product mix toward LAL sales, and sustained pricing stability for company's capital equipment.

74.   The Company also reiterated its 2025 financial guidance in the 1Q25 Earnings Release, stating, in relevant part:

**2025 Guidance**

The company reiterated its 2025 full-year revenue, gross margin and operating expense guidance as follows:

- Revenue of $160.0 million to $175.0 million, representing implied growth of 14% to 25% compared to 2024;

- Gross margin in the range of 71% to 73%, representing an implied increase of 30 basis points to 230 basis points compared to 2024. . . .

75.   On the same day, the Company hosted an earnings call for analysts and

31
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

investors to discuss its financial results for the quarter (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Thunen reiterated the Company's financial performance and touted its sales, stating, in relevant part:

> ***During the quarter, we sold 27,579 LALs and generated $27.2 million in LAL revenue, up 37% compared to the first quarter of 2024*** and down 5% compared to the fourth quarter of 2024.

> ***In the first quarter of this year, LAL revenue represented 72% of total revenue, an increase from 67% and 71% in the first and fourth quarters of 2024, respectively. During the first quarter of 2025, we sold 73 LDDs, up 11% compared to the 66 units in the year ago quarter.***

> On a sequential basis, our LDD units sold during the first quarter were down 12% compared to the seasonally strong capital equipment fourth quarter with the sale of 83 LDDs.

> ***During the quarter, LDD sales generated revenue of $9.4 million, up 8% compared to the first quarter of 2024*** and down 12% versus the strong fourth quarter of 2024. ***As of March 31st, 2025, our LDD installed base stood at 1,044 units, up 43% and 8% versus the first and fourth quarters of 2024, respectively.***

> ***Gross margin in the first quarter of 2025 was 74.8% compared to 70.1% and 71.6% in the first and fourth quarters of 2024, respectively. The increased gross margin was primarily due to lower LAL costs and mix.*** Because we consign LAL inventory, we recognize the LAL cost of goods sold about nine months after we build product.

76.    Also on May 7, 2025, the Company filed its quarterly report for the period ended March 31, 2025, on a Form 10-Q with the SEC (the "1Q25 10-Q"). In addition to reaffirming the Company's previously reported financial results, the Company highlighted its RxSight System sales, stating, in relevant part:

> **Key business metrics**

> We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. ***We believe the number of LDDs installed and LALs implanted are indicators of our ability to drive adoption and generate revenue.***

> ***We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics*** as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric indicative of adoption and

utilization of our RxSight system.

| | 2025 | | 2024 | | |
|---|---|---|---|---|---|
| | Q1 | Q1 | Q2 | Q3 | Q4 |
| LDDs Sold | 73 | 66 | 78 | 78 | 83 |
| Installed Base at End of Period | 1,044 | 732 | 810 | 888 | 971 |

| | 2025 | | 2024 | | |
|---|---|---|---|---|---|
| | Q1 | Q1 | Q2 | Q3 | Q4 |
| LALs Sold | 27,579 | 20,218 | 24,214 | 24,554 | 29,069 |

*During the quarter ended March 31, 2025, we had increased LDD sales of 7 and increased LAL sales of 7,361 when compared to the quarter ended March 31, 2024 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base*.

77.    The 1Q25 10-Q also highlighted certain risks to the Company, posing them as hypothetical, despite them already having materialized:

*The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors*.

Our success will depend, in part, on the acceptance of our RxSight system as safe, effective and, with respect to doctors, cost-effective. We cannot predict how quickly, if at all, patients, doctors, or payors will accept our RxSight system or, if accepted, how frequently it will be used. Our RxSight system and planned or future products we may develop or market may never gain broad market acceptance for some or all of our targeted indications. Patients and doctors must believe that our products offer benefits over alternative treatment methods. To date, a substantial majority of our product sales and revenue have been derived from current customers that have adopted our RxSight system.

*Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.[6]*

We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers, we

---

[6] Emphasis in the original.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions. . . .

78.    The statements detailed above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company was experiencing "adoption challenges" and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) the Company had overstated the demand for its products; (iv) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Emerges

79.    The truth was revealed on July 8, 2025, when, after the market closed, the Company issued the Preliminary 2Q25 Earnings Release, which revealed that the Company was experiencing significant declines in LDD sales, LAL utilization, and overall revenue. The Preliminary 2Q25 Earnings Release stated, in relevant part:

**Preliminary Second Quarter 2025 Results**

- Preliminary second quarter 2025 revenue is expected to be approximately $33.6 million, representing a decrease of 4% compared to the prior year period, and a decrease of 11% compared to the first quarter of 2025, driven by:

  o The sale of 27,380 Light Adjustable Lenses (LAL®/LAL+®), representing a 1% decrease in procedure volume compared to the first quarter of 2025 and a 13% increase in procedure volume compared to the second quarter of 2024; and

> ○ The sale of 40 Light Delivery Devices (LDD™s), representing a 45% decrease compared to the first quarter of 2025 and a 49% decrease compared to the second quarter of 2024.
>
> ○ As of June 30, 2025, the company's installed base stood at 1,084 LDDs, which represents a 34% expansion compared to the installed base of 810 LDDs at the end of the second quarter of 2024.

80.    The Company also substantially lowered its full year 2025 revenue guidance, with the Preliminary 2Q25 Earnings Release stating, in relevant part:

**Revised 2025 Guidance**

The company decreased its 2025 full-year revenue, increased its gross margin percentage and reduced its operating expense guidance as follows:

- Revenue in the range of $120.0 million to $130.0 million, revised downward from the previous guidance range of $160.0 million to $175.0 million, representing an implied decrease of 14% to 7% compared to 2024. . . .

81.    Additionally, Defendant Kurtz was quoted in the Preliminary 2Q25 Earnings Release as stating:

Guided by insights from our second quarter underperformance and building on our long-term vision, we are evolving our commercial approach to re-direct more of our focus toward supporting customer success within new and existing practices[.] By deepening our engagement with our clinical partners, we believe we will be better positioned to ensure they can fully realize the benefits of adjustability and achieve the superior outcomes for their patients that ultimately drive further LAL adoption.

82.    On the same day, the Company hosted the Preliminary 2Q25 Earnings Call. During the Preliminary 2Q25 Earnings Call, Defendant Kurtz revealed that "adoption challenges *over the last few quarters* have been a primary reason for the LDD stall." Specifically, Defendant Kurtz stated, in relevant part:

Well, I would say that we generally believe that LDD sales are driven by the previous generation of successful LAL adopters. So it is critical for us going forward to reverse those utilization trends so that we can point to customers who continue to have success and excellent ROI with the LAL. *And so I do think that the two are linked and that the*

*adoption challenges that we've had over the last few quarters have been a primary underlying reason for the LDD stall*. There are, as I mentioned, some potential quarterly specific things related to longer capital equipment acquisition times, and we tend to be very back-end loaded. But again, if we focus on the areas that we can accelerate and impact LDD in the long run, we believe that is by accelerating LAL utilization.

83.   On this news, RxSight's stock price fell $4.84 per share, or approximately 37.8%, to a close at $7.95 per share on July 9, 2025.

**Insider Sales**

84.   During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Fountain and Maniar sold shares of the Company's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

85.   While the Company's stock price was artificially inflated, Defendant Fountain sold 7,000 shares of RxSight common stock, totaling proceeds of nearly $180,000. Defendant Fountain made the following sale of RxSight stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 3/12/2025 | 7,000 | $25.71 | $179,970.00 |

86.   While the Company's stock price was artificially inflated, Defendant Menair sold approximately 7,301 shares of RxSight common stock, totaling proceeds of approximately $282,000. Defendant Schenkein made the following sales of RxSight stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 11/26/2024 | 3,782 | $45.88 | $173,518.16 |
| 1/22/2025 | 3,519 | $30.87 | $108,631.53 |

87.    As a result of these insider sales, Defendants Fountain and Maniar were unjustly enriched.

***Harm to the Company***

88.    As a direct and proximate result of the Individual Defendants' misconduct, RxSight has lost and expended, and will lose and expend, millions of dollars.

89.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Kurtz and Thunen, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

90.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

91.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

93.    RxSight is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

94.    Plaintiff is a current shareholder of RxSight and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

95.    A pre-suit demand on the Board of RxSight is futile and, therefore, excused. At the time this action was commenced, the ten-member Board was comprised of Defendants Corley, Kurtz, Link, Bakker, Warner, Andrews, Palmisano, Maniar, and Fountain (the "Director Defendants"), as well as non-party Raymond W. Cohen ("Cohen," and together with the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

96.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

97.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

98.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

99.    Defendant Kurtz is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Kurtz also serves as the Company's President and CEO. Thus, as acknowledged by RxSight

in the 2025 Proxy, Defendant Kurtz is a non-independent director. Furthermore, Defendant Kurtz is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

100. Moreover, Defendant Link is not disinterested or independent and is therefore incapable of considering a demand. As the Company concedes in the 2025 Proxy, "Dr. Link is not 'independent' under Nasdaq rules due to certain payments made by us in 2023 and 2024 to a company in which a trust affiliated with Dr. Link is a significant investor and in which Dr. Link's son-in-law serves as the chief executive officer."[7]

101. Defendants Andrews, Fountain, and Bakker served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants

---

[7] According to the 2025 Proxy, "[i]n 2024, we made an aggregate of $821,000 in rebate and commission payments and sold $675,000 of products to Praxis Management, LLC and related Praxis entities, in which a trust affiliated with director William J. Link, Ph.D. is a significant investor and in which Dr. Link's son-in-law serves as the chief executive officer." According to the Company's 2024 proxy statement filed with the SEC on April 25, 2024, the Company made a similar payment to Praxis Management, LLC in 2023.

cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

102.  The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

103.  All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

104.  Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

105.  The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Accordingly, demand is excused as being futile.

106.   Additionally, Corley, Kurtz, Link, Bakker, Warner, Andrews, Palmisano, Maniar, and Fountain each signed the 2025 10-K and each solicited the 2025 Proxy.

107.   Furthermore, Individual Defendants Maniar and Fountain received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.

108.   The Director Defendants are no independent or disinterested in light their longstanding business and personal relationships with each other. For instance, Defendants Andrews and Palmisano each served in positions at Wright Medical Group N.V. and Wright Medical Group Inc. Andrews served as Senior Vice President of Global Finance of Wright Group N.V. from August 2019 until December 2020, and Palmisano served as a member of the board of directors from October 2015 until November 2020. Palmisano also served as CEO and President of Wright Medical Group Inc. from September 2011 until October 2015, and Andrews served as Vice President, Chief Accounting Officer of Wright Medical Group, Inc. from May 2012 until September 2019. Additionally, between April 2003 and April 2007, Defendant Palmisano served as President and CEO of IntraLase Corp. ("IntraLase"), which was co-founded by Defendant Kurtz and of which Kurtz served in numerous leadership positions, including as its initial President and CEO. Defendant Thunen also served as CFO of IntraLase from May 2001 until April 2007. Furthermore, between September 2002 and February 2009, Defendant Link served as a director of Advanced Medical Optics, Inc., which is the company that acquired IntraLase in April 2007.

109.   The acts complained of herein constitute violations of fiduciary duties owed by RxSight's officers and directors, and these acts are incapable of ratification.

110.    Thus, for all of the reasons set forth above, the Director Defendants are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**COUNT I**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

113.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

114.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

115.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's financial

results and sales. Specifically, the 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia* that: (i) the Company was experiencing "adoption challenges" and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (v) as a result of the foregoing, the Company's statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

116.    The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders in voting on the matters set forth for stockholder determination in the 2025 Proxy, including, but not limited to, the re-election of certain of the Individual Defendants to the Board.

117.    The materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Kurtz, Corley, and Bakker, thereby allowing them to continue breaching their fiduciary duties to the Company.

118.    As a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy, the Company has sustained significant damages.

119.    Plaintiff, on behalf of the Company, has no adequate remedy at law

<u>**COUNT II**</u>
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

122.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

123.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124.   Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) the Company was experiencing "adoption challenges" and structural issues; (ii) as a result, the Company was experiencing a decline in sales and utilization; (iii) the Company had overstated the demand for its products; (iv) as a result, the Company was unlikely to meet its previously issued financial guidance for full year 2025; (v) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

125.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

126.   Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the

Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

127.    Furthermore, five of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

128.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

129.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

130.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

131.    Plaintiff, on behalf of RxSight, has no adequate remedy at law.

### COUNT III
### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

134.   Plaintiff, on behalf of RxSight, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants
### For Unjust Enrichment

135.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, RxSight.

137.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from RxSight that were tied to the performance or artificially inflated valuation of RxSight, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

138.   Plaintiff, as a shareholder and a representative of RxSight, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and

1  contractual duties.

2      139.  Plaintiff, on behalf of RxSight, has no adequate remedy at law.

3  **COUNT V**
   **Against the Individual Defendants**
4  **For Waste of Corporate Assets**

5      140.  Plaintiff incorporates by reference and realleges each and every

6  allegation contained above, as though fully set forth herein.

7      141.  The wrongful conduct alleged regarding the issuance of false and

8  misleading statements was continuous, connected, and on-going throughout the

9  time period in issue.  It resulted in continuous, connected, and ongoing harm to the

10  Company.

11      142.  As a result of the misconduct described above, the Individual

12  Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive

13  compensation and bonuses; and (ii) incurring potentially millions of dollars of legal

14  liability and/or legal costs, including defending the Company and its officers against

15  the Securities Class Action.

16      143.  As a result of the waste of corporate assets, the Individual Defendants

17  are liable to the Company.

18      144.  Plaintiff, on behalf RxSight, has no adequate remedy at law.

19  **PRAYER FOR RELIEF**

20  WHEREFORE, Plaintiff demands judgment as follows:

21      A.  Awarding money damages against all Individual Defendants, jointly

22  and severally, for all losses and damages suffered as a result of the acts and

23  transactions complained of herein, together with pre-judgment interest, molded in

24  a fashion to ensure the Individual Defendants do not participate therein or benefit

25  thereby;

26      B.  Directing all Individual Defendants to account for all damages caused

27  by them and all profits and special benefits and unjust enrichment they have

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 18, 2025               **RIGRODSKY LAW, P.A.**

By:    */s/ Gina M. Serra*
       Gina M. Serra, SBN 361172
       1091 N. Palm Canyon Drive, Suite 9
       Palm Spring, CA 92262
       Telephone: (760) 406-8009
       Facsimile: (302) 654-7530
       Email: gms@rl-legal.com

       -and-

**OF COUNSEL:**                  Vincent A. Licata
                                 Leah B. Wihtelin
**GRABAR LAW OFFICE**            825 East Gate Boulevard, Suite 300
Joshua H. Grabar                 Garden City, NY 11530
One Liberty Place                Telephone: (516) 683-3516
1650 Market Street, Suite 3600   Email: vl@rl-legal.com
Philadelphia, PA 19103           Email: lw@rl-legal.com
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com     *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT